[S. F. No. 16016. In Bank.—October 14, 1940.]

JAMES F. McKAY et al., Appellants, v. RETAIL AUTO-
MOBILE SALESMEN'S LOCAL UNION No. 1067
et al., Respondents.

312

I. M. Peckham, Sol A. Abrams, John Francis Neylan and Bartley C. Crum for Appellants.

Hanna & Morton, James M. McRoberts, Cullinan, Hickey & Cullinan, Rogers & Clark, Webster V. Clark, Cullinan, Hickey & Sweigert, Brobeck, Phleger & Harrison and George ·O. Bahrs, as *Amici Curiae*, on Behalf of Appellants.

Mathew O. Tobriner for Respondents.

Valleé, Beilenson & Kenny, Laurence W. Beilenson, William Berger, M. Mitchell Bourquin, Edward P. Murphy, P. J. Murphy, Clarence E. Todd and Samuel W. Gardiner, as *Amici Curiae*, on Behalf of Respondents.

EDMONDS, J.—The question presented for determination in this case concerns the right of labor to picket an employer's place of business. The controversy arose over a demand upon the employer to sign a contract with a union.

By a suit against the employer, the American Federation of Labor and a number of its affiliates, Retail Automobile Salesmen's Local Union No. 1067 and its affiliate, Retail Clerks International Protective Association, Garage Employees Union Local No. 665 and its affiliate, Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, San Francisco Labor Council, and a number of officers of these organizations, the nonunion employees sought an injunction to prevent interference with their employment relations. The case is here upon the plaintiffs' appeal from an order dissolving a temporary restraining order and denying an application for a preliminary injunction.

The only evidence before the trial court in ruling upon the appellants' right to injunctive relief was the verified complaint. It alleges the following facts:

The plaintiffs, thirty-two in number, are employed as salesmen by the defendant Howard Automobile Company, which is a California corporation engaged in the business of selling and repairing automobiles in San Francisco "and elsewhere". In May, 1937, in San Francisco, the plaintiffs, being then all the salesmen employed by the company, united and organized and designated three of their number a committee to negotiate terms and conditions of employment with the company "in accordance with the terms of the Wagner Labor Relations Act". This committee forthwith notified the Regional Director of the National Labor Relations Board and the employer of its appointment, whereupon the employer recognized the committee as the bargaining agent for the entire sales force.

Other allegations of the complaint are that the plaintiffs and the employer are mutually satisfied with the terms and conditions of employment and desire to continue the relationship. Between the plaintiffs and their employer no labor dispute of any kind exists, and none of the plaintiffs has been or is now on strike. None of the plaintiffs is or has any desire to be a member of any of the defendant unions. Neither the plaintiffs nor the company has ever been a party to any agreement with any of the defendant unions or any other labor organization, and neither has ever requested any of the defendant unions to act for any of the plaintiffs as a collective bargaining agency.

The plaintiffs further assert that the Howard Company employs members of all of the defendant unions except members of the Salesmen's Union, and each of these unions has rules and agreements, binding on their respective members and enforceable by fines and penalties, not to pass picket lines or to do business with persons under picket. The placing of a picket at the company's plant will, pursuant to these rules and agreements, "compel" the members of these unions to abstain from visiting, delivering goods to, accepting delivery from, transacting business with, or working for the company.

The complaint also states that the Salesmen's Union has solicited the plaintiffs to join it and, in consequence of their refusal, has "placed a picket around the place of business of said company, and [its members] have congregated there in numbers, and announced their intention to maintain said picket until the said company compels plaintiffs to join said union or discharges said plaintiffs, and until said codefendants of said company have convinced said company that it is profitable for it to sign a contract with said union which would require plaintiff employees to join said union, and if they refuse to join said union, would require said company to discharge plaintiffs and each of them". None of the pickets has been or is an employee of the company. The defendant Labor Council has by resolution approved of the picket, and plaintiffs allege upon information and belief that the council has appointed a "Board of Strategy" to devise ways and means of "exerting pressure and coercion" on the company and on plaintiffs to sign a contract with and join the Salesmen's Union and has placed the company on its "We don't patronize list", a list of firms "boycotted throughout the nation by all organized labor".

Continuing their charges against the defendants, the plaintiffs say that the continuance of the picket has had the effect of "closing down the company's plant, stopping all work therein, and destroying its said business". The unions and their officers have "combined and confederated and conspired to aid, abet and carry out said boycott and said picket, and to fine, coerce and penalize any of their members who violate either boycott or picket". The effect of the boycott and picket is "ruinous to the business of any plant so boycotted or picketed, and coerces said company to deprive plaintiffs

and each of them of their right to earn a livelihood freely and unmolested''. Unless the codefendants of the company are restrained, the company intends to and will discharge plaintiffs or demand that each of them join the Salesmen's Union.

The prayer of the complaint is for a decree enjoining the labor organizations and their representatives from picketing or boycotting the company or ''from in anywise threatening, coercing or intimidating'' the company or any of its employees or customers for the purposes named in the complaint; from ''in any manner interfering with'' the business of the company; from inducing or compelling any of the company's employees to leave its employ; from preventing others from entering the service of the company; and from acting in or aiding any combination or conspiracy to restrain the company in the free and unhindered control of its business.

Upon the filing of this complaint the superior court issued a temporary restraining order in literal accordance with the terms of the prayer and an order to show cause why a preliminary injunction should not issue. All of the defendants except the employer joined in a demurrer to the complaint, which challenged it on both general and special grounds. The application for the injunction was heard with the demurrer and submitted upon the allegations of the verified complaint. The trial court sustained the demurrer with leave to amend, dissolved the temporary restraining order and denied the application for a preliminary injunction. The appeal has been taken only from the orders denying injunctive relief.

Broadly stated, the position taken by the plaintiffs in their briefs is that in the absence of any dispute between themselves and their employer, the defendants have no right to interfere in any way with their employment relations. On the other hand, the labor organizations and their officers maintain that they collectively have a direct, substantial and legitimate interest in the employment relations of the company, and that since they are employing means which are entirely lawful, their activities may not be enjoined.

The history of the law governing the right of workingmen to combine in order to bargain for better working conditions is marked by much divergence of opinion, with many changes through the years. In England, until 1824,

combinations of laborers to raise wages or shorten hours or to affect business in any way were criminal even if there was no resort to a strike (5 Geo. IV C. 95; 6 Geo. IV C. 129; 34 Edw. III C. 9; *Rex* v. *Journeymen-Taylors,* 8 Mod. 10, 88 Eng. Repr. 9), and until after the middle of the nineteenth century it was a crime to threaten a strike for any purpose (*Walsby* v. *Anley,* 3 El. & El. 516, 121 Eng. Repr. 536; *Skinner* v. *Kitch,* 10 Cox, C. C. 493, L. R. 2 Q. B. 393), or to combine peacefully to persuade employees to leave work without picketing (*Reg.* v. *Rowlands,* 2 Den. C. C. 363, 17 Q. B. 671, 117 Eng. Repr. 1439). The sanctions of the criminal law against combinations of workingmen in furtherance of their interests were not finally relaxed until 1875 (The Conspiracy and Protection of Property Act, 38 & 39 Vict. C. 86, sec. 3).

Development of the early law in this country shows a similar trend. Workingmen who combined for any purpose opposed to the interest of their employer were indicted and punished as members of a criminal conspiracy. (*People* v. *Melvin,* 2 Wheeler C. C. (N. Y.) 262 (1810); *People* v. *Fisher,* 14 Wend. 9 (N. Y. 1835) [28 Am. Dec. 501]. See, also, Nelles, The First American Labor Case, 41 Yale L. J. 165 (1931); Witte, Early American Labor Cases, 35 Yale L. J. 825, 826 (1926); Landis, Cases on Labor Law, p. 28 et seq.) And although in 1842 Massachusetts held that workingmen who quit work in concert to compel an employee to join their association were not guilty of a crime (*Commonwealth* v. *Hunt,* 45 Mass. 111 [38 Am. Dec. 346]), until the end of the nineteenth century the criminal conspiracy doctrine was applied to associations of workmen to prevent strikes for any purpose. (*State* v. *Donaldson* (1867) 32 N. J. L. 151 [90 Am. Dec. 649]; *Commonwealth* v. *Curren,* (1869) 3 Pittsb. Rep. 143; *Commonwealth* v. *Sheriff,* (1881) 15 Phila. 393; *People* v. *Wilzig,* (1886) 4 N. Y. Cr. 403.) In the meantime the labor injunction had come into general use in this country. (See Frankfurter & Greene, The Labor Injunction, p. 17 et seq.; Bonnet, The Origin of the Labor Injunction, 5 So. Cal. L. Rev. 105 (1931).) In recent years the courts have gradually recognized that immediate betterment of working conditions is a legitimate object of concerted activities by employees, but there has been a wide difference of opinion as to what means may be lawfully used for the attainment of labor's ends.

■ The parties are entirely correct in their agreement that, under the law as it has developed in recent years, an intentional interference with the advantageous economic relations of others by the members of labor organizations is not tortious unless violence is used or the object sought to be accomplished has no reasonable relevance to labor conditions. Therefore, the issues in the present controversy include only two questions: Whether the specific activities carried on by the defendants are peaceful, and, further, whether there is any legal justification for their conduct in view of the objects which they seek to attain.

■ Concerning the means used, it must be taken as settled in this state, that workmen may associate together and exert various forms of economic pressure upon employers, provided they act peaceably and honestly. The conventional means of exerting this economic pressure which have been held lawful are the strike (*Pierce* v. *Stablemen's Union,* (1909) 156 Cal. 70 [103 Pac. 324] ; *Parkinson Co.* v. *Building Trades Council,* (1908) 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550] ; *Southern Calif. Iron & Steel Co.* v. *Amalgamated Assn.,* (1921) 186 Cal. 604 [200 Pac. 1] ; *Lisse* v. *Local Union,* (1935) 2 Cal. (2d) 312 [41 Pac. (2d) 314]) ; the boycott, both primary and secondary (*Parkinson Co.* v. *Building Trades Council, supra; Pierce* v. *Stablemen's Union, supra; Southern Calif. Iron & Steel Co.* v. *Amalgamated Assn., supra*) ; and the picket (*Lisse* v. *Local Union, supra; In re Lyons,* 27 Cal. App. (2d) 182 [80 Pac. (2d) 745]).

■ It is true that the early cases in the state intimated that picketing in any form was illegal (*Rosenberg* v. *Retail Clerks' Assn.,* (1918) 39 Cal. App. 67 [177 Pac. 864] ; *Pierce* v. *Stablemen's Union, supra*), and that *Moore* v. *Cooks etc. Union,* 39 Cal. App. 538 [179 Pac. 417], held that peaceful picketing was *per se* unlawful. However, those conclusions were expressly renounced by this court in *Lisse* v. *Local Union, supra.* Indeed, the modern trend of decision clearly indicates that the right to picket peacefully and truthfully is one of organized labor's lawful means of advertising its grievances to the public, and as such is guaranteed by the Constitution as an incident of freedom of speech." (*Carlson* v. *California,* (1940) 310 U. S. 106 [60 Sup. Ct. 746, 84 L. Ed. 668] ; *Thornhill* v. *Alabama,* (1940) 310 U. S. 88

[60 Sup. Ct. 736, 84 L. Ed. 659] ; *In re Lyons, supra* (1938) ; *People* v. *Harris,* (1939) 104 Colo. 386 [91 Pac. (2d) 989, 122 A. L. R. 1034] ; 48 Yale L. J. 308, 312 (1938).) But the law clearly requires that concerted action by union workers be peaceful. Acts of violence or "acts amounting to physical intimidation" will be enjoined. (*Goldberg etc. Co.* v. *Stablemen's Union,* (1906) 149 Cal. 429 [86 Pac. 806, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460] ; *Southern Calif. Iron & Steel Co.* v. *Amalgamated Assn., supra; Lisse* v. *Local Union, supra.*)

There is nothing in the complaint now being considered which indicates that the activities of the defendants were anything other than peaceful and honest within the meaning of the controlling authorities. The complaint alleges merely that the Salesmen's Union had placed a picket around the place of business of the employer and that persons acting for it have congregrated there in numbers and announced their intention to maintain this picket until their demands are complied with. Such conduct is not *per se* unlawful. (*Lisse* v. *Local Union, supra; In re Lyons, supra.*) True, the plaintiffs use the words "compel" and "coerce" in connection with the activities of the defendants, but by these words, in the light of the only specific activities alleged, the pleader does no more than to charge that the compulsion or coercion, though peaceful, was unlawful, which, of course, is only a conclusion.

It is a fundamental principle that the drastic sanctions of equity may not be invoked without a detailed showing of specific facts justifying such relief. (*Golden State Glass Corp.* v. *Superior Court,* 13 Cal. (2d) 384 [90 Pac. (2d) 75].) This rule is applicable to suits for injunctions in labor controversies and has been so applied in this state. In *Davitt* v. *American Baker's Union,* 124 Cal. 99 [56 Pac. 775] (1899), the plaintiffs sought injunctive relief against a labor union charging interference with their business by "force, menace and threat" and by the circulation of "false and malicious publications" at and near their place of business. Such averments were held to be too general to warrant relief, the court saying: "Conceding the formation of a conspiracy is charged, having for its object a common design and purpose, still we find no statement in the bill as to any specific overt act done by defendants in

pursuance of that design and purpose. A conspiracy, however atrocious its purpose, is not the subject of a civil action, for it does not damage. (*Herron* v. *Hughes,* 25 Cal. [555] 560.) There is no allegation whatever showing the particular threats defendants made, what amount or kind of force defendants used, what kind or character of menace was exercised, or how the business was to be boycotted.''

So the acts charged against the defendants are not unlawful because of the plaintiffs' allegation that they amount to coercion. One is not intimidated or coerced, in the sense of unlawful compulsion, by being induced to forego business relations with A rather than lose the benefit of more profitable relations with B. As Justice Angellotti said in his concurring opinion in the Parkinson case, an employer who yields to his employees' demands ''may be said to have been coerced into doing so by fear that if he does not, he will not be able to obtain such employees as will enable him to properly carry on his business, but this is not the kind of coercion of which the courts can take notice''. In the opinion written by Justice Sloss the same view is expressed.

It is equally beside the question to speak of threats, where that which is threatened is only what the party has a legal right to do. In one of his dissenting opinions Mr. Justice Holmes succinctly commented upon the use of such terms as follows: ''I pause here to remark that the word 'threats' often is used as if, when it appeared that threats had been made, it appeared that unlawful conduct had begun. But it depends on what you threaten. As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do, that is, give warning of your intention to do in that event, and thus allow the other person the chance of avoiding the consequences. So as to 'compulsion', it depends on how you 'compel' . . . So as to 'annoyance' or 'intimidation'.'' (*Vegelahn* v. *Guntner,* (1896) 167 Mass. 92, 107 [44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722].)

In many of the decided cases where injunctive relief was granted, facts were alleged or proved which showed that violence had been threatened either expressly or impliedly. The complaint here in controversy includes no allegations concerning such acts, and it states no cause of action if the object of the defendants' conduct was a lawful purpose.

■ It is the well-established law of this state that members of a union or group of affiliated unions are privileged to refuse to work in the same shop or on the same job with other workmen irrespective of whether the latter have united or organized themselves into a separate trade union. And competition for work being an entirely lawful activity, whether the competing groups be unions, or unions and individuals, a court of equity may not interfere by restraining the use of any lawful form of concerted action used in the struggle. (*Parkinson Co.* v. *Building Trades Council, supra.*) The principle that a closed union shop is a proper object of concerted action by employees has been widely recognized in other jurisdictions (*Williams* v. *Quill,* (1938) 277 N. Y. 1 [12 N. E. (2d) 547]; *Fenske Brothers* v. *Upholsterers' International Union,* (1934) 358 Ill. 239 [193 N. E. 112, 97 A. L. R. 1318]; *Bayonne Textile Corp.* v. *American Federation of Silk Workers,* (1934) 116 N. J. Eq. 146 [172 Atl. 551, 92 A. L. R. 1450]; *Seymour Ruff & Sons* v. *Bricklayers etc. Union,* (1933) 163 Md. 687 [164 Atl. 752]; *Grant Construction Co.* v. *St. Paul Building Trades Council,* (1917) 136 Minn. 167 [161 N. W. 520, 1055]; *Scofes* v. *Helmar,* (1933) 205 Ind. 596 [187 N. E. 662]; *Cohn & Roth Elec. Co.* v. *Bricklayers etc. Union,* (1917) 92 Conn. 161 [101 Atl. 659, 6 A. L. R. 887]; *Meier* v. *Speer,* (1910) 96 Ark. 618 [132 S. W. 988, 32 L. R. A. (N. S.) 792]; *Jetton-Dekle Lumber Co.* v. *Mather,* (1907) 53 Fla. 969 [43 So. 590]; *contra, Hotel & Railroad News Co.* v. *Clark,* (1922) 243 Mass. 317 [137 N. E. 534]; *Cooks' etc. Union* v. *Papageorge,* (1921) (Tex. Civ. App.) 230 S. W. 1086) and has been adopted by the American Law Institute in its Restatement of the Law of Torts. (Vol. 4, sec. 788.)

To the contrary, many other courts have decided that the forcing of such a choice upon employees by labor unions is itself an unlawful interference with the "absolute, inherent and indefeasible right" of the individual employee to work under such conditions as he may choose. But the Supreme Court of the United States holds that there is no constitutional right inhering in individuals to work as nonunion employees. (*Senn* v. *Tile Layers Protective Union,* 301 U. S. 468 [57 Sup. Ct. 857, 81 L. Ed. 1229].) ■ And the law of California, as stated in *Parkinson Co.* v. *Building Trades Council, supra,* is that the members of a labor union are privileged to bring such lawful pressure to bear, as is within

their control, in order to induce nonunion employees to join their union. The defendant unions and their officers contend that the facts of that case are exactly the same in principle as those alleged in the plaintiffs' complaint, and that the conclusion there reached is determinative of the present controversy.

In the Parkinson case, the plaintiff, which was the employer, maintained a lumber yard, mill and plumbing and tinning shop and employed a nonunion tinner. Its other employees, who belonged to several affiliated unions of the American Federation of Labor, demanded that the tinner be compelled to join the Tinner's Union or be discharged. Both the tinner and the employer refused to accede to the unions' demands, with the result that the community labor council called a strike and secondary boycott against the employer. "Unfair notices" were sent to contractors and other customers of the employer, which according to union rules precluded the employees of these customers from working on or with materials furnished by the employer.

The resulting strike and boycott were conducted peaceably, and, with minor exceptions, no threats of force or harm to anyone. A short time after the strike, the employer was able to secure nonunion men and resume operation of its plant, but the secondary boycott against its customers was continued in force by the unions. The employer brought suit against them for injunctive relief and damages, and after a trial the superior court issued a permanent injunction broadly restraining the defendants from interfering with its business.

Upon appeal this court reversed the judgment and held, six justices concurring in three separate opinions and one justice dissenting, that the plaintiff was not entitled to relief. All of the members of the court agreed, however, that the attempt by the defendants to secure a closed union shop was a legitimate object of collective action and the right of workingmen to combine in order to better the terms and conditions of their employment was fully recognized. Such combination was found to be the "necessary and desirable counterpart" of business combinations in order to enable workmen to compete in a "fair and equal way" in the struggle for existence. The ultimate motive for their activities was self-interest—"to secure employment on more favorable terms for themselves", and in pursuit of that purpose they could lawfully

attempt "to secure employment by the plaintiff, to the. exclusion of those not associated with them".

And there was said to be no valid distinction between union members withholding labor from their employer, with whom they had some dispute arising out of his treatment of workers, and withholding business from his customers, against whom they had no other dispute than that they were assisting the employer by trading with him. In other words, said the court, members of affiliated unions who were not employees of the employer, might lawfully engage in concerted activities against him for no other motive than that they considered him unfair to their associates. There was damage to the employer, to his customers and to his nonunion employees, but this damage was held to be merely one of the consequences of the "struggle of competition" and was therefore justified in law.

The plaintiffs do not challenge the soundness of these principles but urge that they do not apply here because there is no "strike" and no "labor dispute". It is said that the related craft members "only ceased working because of the penalty imposed for passing a picket line" placed around the company's premises by the "irresponsible" Salesmen's Union. Such an interpretation of the facts assumes a lack of solidarity among the affiliated crafts and an unwillingness on the part of the members to cooperate in the action directed against the employer—an assumption which is negatived by every circumstance in the case. Moreover, as has been pointed out in *C. S. Smith Metropolitan Mkt. Co.* v. *Lyons* (*post*, p. 389 [106 Pac. (2d) 414]), the term "labor dispute" is a broad one, and, in the absence of statutory definition, may be properly applied to any controversy "which is reasonably related to employment and to the purposes of collective bargaining".

The complaint alleges that all the unions and their officers have "combined, confederated and conspired to aid, abet and carry out said boycott and said picket" and that the defendant Labor Council "has by resolution approved of said picket" and has "appointed a Board of Strategy for the purpose of devising ways and means of exerting pressure and coercion on said company and plaintiffs, and has placed said company on the 'We don't patronize list', a list of firms boycotted through the nation by all organized labor". These averments show that all of the defendants are acting in har-

mony in their effort to secure a union shop contract. ██
The further allegations that the unions are ''conspiring . . .
to fine, coerce and penalize any of their members who violate
either boycott or picket'' mean no more than that the union
members by contract and pledge have bound themselves to
join in any unified action affecting their interests. In this
there is no more ''coercion'' than there is in compelling the
performance of any contract.

██ The fact that the defendant unions are craft organi-
zations does not preclude them from consolidating to obtain
an industrial bargaining unit. (See 6 Chicago L. Rev. 675.)
The complaint alleges that these unions are affiliated with the
American Federation of Labor, and also that they are mem-
bers of the defendant Labor Council. This indicates that they
are proceeding with some unity toward the objectives they
seek. To hold, as the plaintiffs insist the court should, that
separate organizations may not join forces in labor contro-
versies for the purpose of obtaining a closed shop would es-
tablish a rule of law discriminating against the labor groups
in this state which are organized horizontally, or into crafts,
and in favor of the vertical or industrial type of union. For
if the other employees of the company belonged to a single
union they would be privileged, under the California author-
ities, to engage in any peaceful and lawful activities in order
to compel the members of the sales department to, join their
union.

Viewed in this light the present case cannot be distinguished
from the Parkinson case so far as the acts of organized labor
are concerned. The facts in the two cases are parallel. There
the tinner was satisfied with his job and his services were
satisfactory to the employer; here the plaintiffs and the com-
pany are mutually satisfied with the terms and conditions of
employment. There, as here, the defendants, who were mem-
bers of affiliated trade unions employed in the company's
plant and elsewhere, engaged in activities which were not
*per se* unlawful in order to induce nonunion employees of the
company to join a union affiliated with the defendants. In
each case the defendants' purpose was to obtain a closed
union shop.

██ That some of the defendants in the present case are
not employees of the company does not render their conduct
unlawful; there was the same situation in the Parkinson case.

If anything, the Salesmen's Union here has a more direct self-interest in organizing the company into a closed union shop than did the "outsiders" in the Parkinson case. The picketing here is merely a concomitant of the strike, just as the secondary boycott was the concomitant of the strike in that case. In both cases the concerted activities of the various unions were undertaken at the instigation and with the approval of a labor council, which appears to be the organization responsible for formulation of the policy and coordination of activities of the affiliated unions.

Nor does the fact that in the present case relief is sought by nonmember employees rather than by the employer serve to distinguish the two cases. This court in the Parkinson case found justification for the defendants' conduct in the workingman's struggle for existence, Chief Justice Beatty saying: "In order to secure employment on more favorable terms for themselves, individuals have an absolute right to combine for the purpose of preventing employment and competition of others". Justice Sloss, in a concurring opinion, summarized the position of union labor as follows: "The defendants were seeking, in all they are shown to have done, to secure employment by the plaintiff for themselves, to the exclusion of those not associated with them, and to secure that employment upon terms deemed satisfactory or advantageous to them. That is the effort of every dealer in goods: it is the struggle of competition and is no more frowned upon where the subject of trade is labor than where it is a specific commodity." Stated in another way, the principle or rationale involved is that a court should not use its coercive implements to aid one party in an economic struggle in which the other party has a substantial interest at stake and is employing means which are not in themselves unlawful.

The interest of the defendant unions in the present controversy is direct and obvious. The closed union shop is an important means of maintaining the combined bargaining power of the workers. Moreover, advantages secured through collective action redound to the benefit of all employees whether they are members of the union or not, and members may resent nonmembers sharing in the benefits without liability for the obligations Hence a closed shop policy is of vital importance in maintaining not only the bargaining power but also the membership of trade unions. These considera-

tions serve to justify the defendants' conduct as much against the complaint of nonmember employees as against the complaint of an employer. (See authorities cited in *C. S. Smith Metropolitan Market Co.* v. *Lyons, supra.*)

Counsel for the employer contend that by the decision in *Overland Publishing Co.* v. *H. S. Crocker Co., Inc.*, 193 Cal. 109 [222 Pac. 812], this court has limited the principles established and applied in the Parkinson case. However, in the Overland case the plaintiff, who was engaged in the stationery business, brought suit for damages under the Cartwright Act (Stats. 1907, p. 984, as amended, Deering's Gen. Laws, Act 4166 [Deering's Gen. Laws 1937, Act 8702]) against the members of the Printers' Board of Trade, an association of stationers which, it was charged, constituted a combination in restraint of trade. The complaint alleged, among other things, that the defendants had entered into agreements with the printers, pressmen, and bookbinders' unions in San Francisco by which the union members agreed to work for only such stationers as were members of the defendants' association, and pursuant to that agreement all plaintiff's union employees were called out on strike "solely pursuant to an order of the defendants" in order to compel plaintiff to join defendants' association. The court held that these acts were in violation of the Cartwright Act. That determination has no bearing upon the facts of the present case. The attempt to induce an employer to become a member of an employers' association is not reasonably related to either the working conditions or the bargaining power of the union members and was plainly an unlawful object of concerted action on their part.

 Nor can the contention be sustained that, whatever justification may exist for defendants' conduct under the general principles of equity, sections 920-923, inclusive, of the California Labor Code compel the conclusion that the defendants' actions are unlawful interference with their rights. In the case of *Shafer* v. *Registered Pharmacists Union Local 1172,* S. F. No. 16200 (*post,* p. 379 [106 Pac. (2d) 403]), which was considered and decided concurrently with the appeal in the present case, it was held that this legislation does not prohibit closed union shop contracts nor lay any restrictions upon labor in its efforts to compel employees to join a particular union.

Considering other allegations of the complaint, the defendants are charged with a conspiracy to cause damage to the plaintiffs and their employer. However, the employer is seeking no relief, although the threatened injury to it may affect the plaintiffs; that is, as the complaint charges, unless the defendants are restrained, the employer intends to and will discharge plaintiffs if they do not join the Salesmen's Union. The threatened damage to the employer, therefore, has significance only in so far as it may, by reason of economic pressure and choice, result in damage to the plaintiffs.

Moreover, the damage to the plaintiffs may not accurately be characterized as loss of their jobs or absolute denial of their "right to work", as much of the argument in some of the briefs implies. The extent of the damage to the plaintiffs is no more than presentation of a choice between leaving the work of their present employer, either voluntarily or upon its demand, or joining the Salesmen's Union. This choice is forced upon them by the concerted action of other salesmen who are competing with them in the sale of automobiles and by the members of allied trade unions.

It is also urged that the complaint shows that the plaintiffs have established their own labor organization to bargain collectively with the employer and that under such conditions any attempt by the defendants to "unionize" them or to interfere with their employment relations is unlawful. But there are two fundamental and equally conclusive reasons why this contention cannot be sustained.

First, this is a suit in which the employees only are seeking relief. The employer, although named as a party defendant, did not make an appearance in the trial court. Assuming, without deciding, that an employer may be entitled to equitable protection from injury to his business as the result of a true jurisdictional dispute between rival unions, it is, nevertheless, the settled law of this state that a group of the employer's workers can claim no such protection. This conclusion follows inescapably from the principles established in *Parkinson Co.* v. *Building Trades Council, supra.* The interest of the defendant unions in inducing the plaintiffs to join a union satisfactory to them is just as substantial as it would be if the plaintiffs were unorganized. The element of competitive struggle between workmen is still present, except that the group of thirty-two self-organized salesmen in the present

case is a stronger competitor than was the lone tinner in the Parkinson case.

The case of *Greenwood* v. *Building Trades Council,* 71 Cal. App. 159 [233 Pac. 823], is squarely in point and decisive of the question. There a dispute had arisen between two rival unions in the building trades industry. Sheet Metal Workers Union, Local 162, had been chartered by the American Federation of Labor; Sheet Metal Workers Union, Local 2, was not affiliated with the A. F. of L. but it was a member and had the recognition of the local Building Trades Council, a group of A. F. of L. unions. Local No. 162 refused to pay dues to the Building Trades Council, which in turn sent notices to all the building trades employers that its members would refuse to work on construction jobs where members of Local No. 162 were employed. In a suit for injunctive relief brought by the members of Local No. 162 it was held, upon the authority of the Parkinson case, that the boycott instituted by the members of the Building Trades Council could not be enjoined. It must be deemed settled, therefore, that one labor union may not have the protection of equity against the lawful competitive activities of a rival union.

 Moreover, the facts alleged by the plaintiffs do not sufficiently show that they have organized a *bona fide* independent labor union. The complaint alleges only that they have ''united, organized and designated three of their number a committee 'to bargain with the company' in accordance with the terms of the Wagner Labor Relations Act''; that the committee notified the company and the Regional Director of the National Labor Relations Board of plaintiffs' choice of bargaining representative; and that the ''company then and there recognized said committee as bargaining agents for the entire sales force . . . '' The effect of the averments concerning the National Labor Relations Act need not be considered, for nowhere in the complaint does it appear that the National Labor Relations Board has certified the plaintiffs' organization as a bargaining agent, or even that the Howard Automobile Company is engaged in interstate commerce. Moreover, the allegations that they formed a labor organization ''in accordance with the Wagner Labor Relations Act'' is a mere legal conclusion.

The remaining allegations fall far short of affirming the existence of a freely organized and independent trade union.

The plaintiffs constitute only a portion of the employees of a single plant; they have no affiliation with any external labor organization; and they apparently have no constitution, by-laws, pledges or rules. In addition there is an apparent unity of interest between the plaintiffs and the defendant employer which negatives any inference that the plaintiffs have a *bona fide* and independent bargaining organization.

The need for specific allegations concerning the nature of such an organization is clear where, as here, the complaint itself is the only evidence before the court in deciding the issue of temporary injunctive relief. It has been demonstrated that the granting of temporary injunctions in labor disputes usually has the effect of determining and terminating the entire controversy. (Frankfurter and Greene, The Labor Injunction, p. 47 et seq.) The legislature has declared that interference by an employer in the collective bargaining processes of his employees is contrary to the public policy of this state. (Labor Code, sec. 923.) This necessarily means that employee organizations are unlawful when they are formed, subservient to the employer's will, chiefly in order to forestall the unionization of his plant by independent labor unions. To be sure, the functional weakness of a single-department organization like the present one is not itself proof of employer domination. But it is a factor which should lead a court to scrutinize carefully all the circumstances surrounding its formation. (See 40 Columb. L. Rev. 278.) If the legislative policy is to be made effective courts cannot close their eyes to the subtle realities of industrial strife.

Of course, the employer and its salesmen argue that the appellants have no right to interfere with relations which are entirely satisfactory to them. This position ignores the broader rights of labor in seeking to advance the interests of the worker by more thorough and complete organization. And although it is undeniable that many unworthy persons within labor's ranks have abused their power, on the other hand, the record of employers is not one of entirely altruistic purposes. Labor insists that in a free economy, the right to tell the public, upon whose patronage both depend for existence, the facts concerning employment in any particular business, is essential to its welfare and entirely consistent with democratic principles.

The public ultimately pays the full cost of every labor dispute and better labor relations must be established. But if they cannot be brought about by enlightened self-interest the remedy lies with the legislature—not in the courts—in so far as contests peaceably conducted for a purpose legitimately connected with the welfare of labor as a whole is concerned.

The orders are, and each of them is, affirmed.

Gibson, C. J., and Carter, J., concurred.

MOORE, J., *pro tem.*, Concurring.—I concur. The question involved in this case is whether the picket line around defendant employer's establishment is illegal. If the picket line be maintained by threat to use force or if its aim be to achieve an illegal purpose, it should be enjoined. But if it is maintained by neither immoral nor illegal means and if its purpose is to effectuate a lawful end, it should not be subjected to any restrictive order of the court. The allegations of the complaint do not set forth that any act has occurred whereby plaintiffs suffer any fear of violence. Hence, upon that ground defendants cannot be enjoined. We have, therefore, to determine (1) whether defendants purpose to effectuate the execution of a contract between the employer and the union be an illegal practice, and (2) whether the peaceful picketing by defendants to persuade the employer to execute such a contract gives occasion for equity to interfere.

In order to enforce a demand reasonably related to labor conditions a union is justified, by a long line of decisions, in resorting to any peaceable legal means. The courts have supported the union's right to strike, picket and boycott in the enforcement of such demands including the right to induce those in sympathy with its cause to withdraw patronage from an employer. (*Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550]; *Pierce* v. *Stablemen's Union*, 156 Cal. 70 [103 Pac. 324]; *Lisse* v. *Local Union*, 2 Cal. (2d) 312 [41 Pac. (2d) 314].) If the motive actuating a strike is immaterial (*Greenwood* v. *Building Trades Council*, 71 Cal. App. 159 [233 Pac. 823]) we must then determine whether the fact that union and individual defendants are not employees of

the defendant automobile company renders their picket line illegal.

If the acts of defendants are to be condemned, such condemnation must be founded upon statute or upon court decisions or it must be shown to violate good morals. We find no language in the Labor Code that outlaws a contract between union and employer. The chief aim of sections 921–923 was to remove from the path of labor the yellow dog contract at first canonized in some court decisions but later repudiated by legislatures and by the highest courts. Section 921 inhibits the promise at the time of employment of either worker or employer to join or not to join or withdraw from an employer or an employee organization. Section 922 forbids anyone to coerce an applicant for employment not to join a labor organization. This is an apparent effort of the legislature to preserve the economic freedom of the toiler from the oppression of the employer. But the legislature could not have intended to suppress competition among workers. They have the same right to carry on their struggle as they have always had since the decision by this court in the Parkinson case. A part of the program of every labor group is to gain the favor of employers and the effort of any group will not be interrupted by the courts because such effort may result in the defeat of a minority or of a majority. The struggle for existence and the struggle for supremacy of labor groups, as among themselves, should continue unhindered by judicial interference so long as they maintain peace and order. Nowhere have the lawmakers suggested that an organized group of workers shall not seek to induce an employer, by peaceable means, to enter into a contract to the effect that he will employ only members of their organization or affiliated bodies. The argument is made that the success of the union's picket will require the Howard Automobile Company to violate public policy as defined by section 922. But section 923 clearly indicates that it was the employer against whom the workers are to be protected. After there declaring why negotiation between employer and employee "should result from voluntary agreement between employer and employees", it proceeds: "Therefore, it is necessary that the individual workman have full freedom of association" etc., and "that he shall be free from the interference, restraint or coercion of employers" etc. That the legislature could not have intended

to limit the activities of any labor union in seeking advantage over another is emphasized by the facts: (1) That the right to do so was vouchsafed by the Parkinson decision more than thirty years ago, and (2) that said sections of the Labor Code are the fruit of the effort of organized labor.

The Norris-La Guardia Act, which is a fair attempt to express the public policy of the nation in regard to labor controversies, makes provision that a labor dispute includes any controversy seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee. In *Lauf* v. *E. G. Shinner & Co.*, 302 U. S. 669 [58 Sup. Ct. 41, 82 L. Ed. 516], the Supreme Court held that while an employer cannot coerce his employees, yet the union may compel him to do so. If then the picket line of the defendants is peaceably maintained and if its purpose is to enforce a demand of the workers upon the employer of labor, wherein lies its illegality? Certainly the right of a worker to publish his criticism, and to speak freely of an employer's attitude toward union labor will not be denied even though the legislature may attempt by statute to curb such criticism. (*De-Jonge* v. *State of Oregon*, 299 U. S. 353 [57 Sup. Ct. 255, 81 L. Ed. 278]; *Herndon* v. *Lowry*, 301 U. S. 242 [57 Sup. Ct. 732, 81 L. Ed. 1066]; 14th Amendment, United States Constitution.)

If labor should be prohibited from publishing all the facts concerning employment by an employer, the worker would be deprived of rights emphatically and often declared. The assertion that defendants "conspired" to injure the employer could have no significance unless they were engaged in a criminal or unlawful enterprise. (*Parkinson Co.* v. *Building Trades Council, supra.*) The demands of a union to strengthen its forces cannot be deemed unlawful even though there be no controversy between the employer and his employees. (*In re Lyons*, 27 Cal. App. (2d) 293 [81 Pac. (2d) 190].) There is no provision in the organic law which forbids the unions of organized labor from competing with unorganized workers. In the case of *Senn* v. *Tile Layers Protective Union*, 301 U. S. 468 [57 Sup. Ct. 857, 81 L. Ed. 1229], Justice Brandeis said: "Earning a living is dependent upon securing work; and securing work is dependent upon public favor. To win the patronage of the public, each may strive

by legal means. Exercising its police power, Wisconsin has declared that in a labor dispute peaceful picketing and truthful publicity are means legal for unions. It is true that disclosure of the facts of the labor dispute may be annoying to Senn even if the method and means employed in giving publicity are inherently unobjectionable. But such annoyance, like that often suffered from publicity in other connections, is not an invasion of the liberty guaranteed by the Constitution. . . . It is true that disclosure of the facts may prevent Senn from securing jobs which he hoped to get. But the hope for a job is not property guaranteed by the Constitution. The diversion of it to a competitor is not an invasion of a constitutional right.''

Also, in the case of *Nann* v. *Raimist*, 255 N. Y. 307 [174 N. E. 690, 73 A. L. R. 669], it was declared by Justice Cardozo that the legality of defendant's conduct is not affected by the fact that no strike was in progress in any of the plaintiff's shops; that if the defendant believed in good faith that the policy pursued by plaintiff and by the shops united with the plaintiff was hostile to the interests of organized labor and was likely, if not suppressed, to lower the standards of living in the trade, defendants had the privilege by the pressure of notoriety and persuasion to bring its own policy to triumph. See *Exchange Bakery & Restaurant* v. *Rifkin*, 245 N. Y. 260 [157 N. E. 130], where it was held that in order that a union may prevail, it may call a strike and picket the premises of an employer with the intent of inducing him to employ only union labor. ''Picketing without a strike is no more unlawful than a strike without picketing. Both are based upon a lawful purpose. Resulting injury is incidental and must be endured.'' (*Ibid.*) If the legislature had intended to outlaw a contract between a union and an employer, obligating the employer to hire only members of the labor organization, it would have said so in terms unmistakable, for the subject has been aired in the American courts for more than a generation and has long been the theme of the publicist and the editor. Men engaged in the serious undertaking of enacting laws for a great commonwealth could not have overlooked a matter of such universal importance. On the contrary, the lawmakers have afforded to organized labor every reasonable device for the conduct

of its campaign to effectuate its plan of procuring employment for union members to the exclusion of other workers. For illustration, section 1011 of the Labor Code inhibits an employer from misrepresenting the kind of labor in his employ. Section 1110 upholds an agreement between two or more persons to do or not to do any act in furtherance of any trade dispute between employers and employees.

In the Parkinson case, *supra,* the entire court agreed that the attempt by defendant to secure a closed union shop was a legitimate objective. Therefore, since there is no statutory inhibition against the contract which defendant union seeks to have defendant automobile company enter into with said union, and since this court has already held that such a contract is a legitimate objective, for this court now to deprive an organized group of workers from procuring the execution of such a contract, where they are using only peaceful persuasion to achieve their purpose would render the court a law-making body instead of a law-interpreting tribunal.

CURTIS, J., Dissenting.—I dissent.

This is an action by certain individuals, thirty-two in number, employed as salesmen by defendant Howard Automobile Company, to enjoin defendant Retail Automobile Salesmen's Local Union, No. 1067, its members, and those acting on its behalf from picketing the place of business of the Howard Automobile Company and advertising the business as unfair to labor. A demurrer interposed by the defendants to the joint complaint filed by the plaintiffs was sustained with leave to amend by the trial court, and the temporary restraining order theretofore issued was dissolved and the application for a temporary injunction was denied. This appeal is taken from the order dissolving the temporary restraining order and denying the application for a temporary injunction.

As the case was decided upon the sustaining of a demurrer, by virtue of which fact the allegations of the complaint are necessarily accepted as true, a brief *résumé* of the complaint is necessary. The pertinent facts therein alleged are as follows:

(1) Plaintiffs are all salesmen of the Howard Automobile Company, a corporation engaged in the auto selling and repairing business in San Francisco and elsewhere and are all satisfied with the terms, pay, hours of work, conditions

of employment, and desire to continue therein, and the company is satisfied with the terms, pay, hours and conditions of employment and with plaintiffs' services and desires to continue plaintiffs in its employ.

(2) In May of 1937, at San Francisco, plaintiffs then and there all of the salesmen of said company organized and designated three of their number a committee to negotiate rates of pay, wages, hours of labor and other conditions of employment with the company in accordance with the terms of the Wagner Act and said committee notified the company and the Regional Director of the Labor Relations Board of their choice of a bargaining representative and the company then and there recognized the committee as the bargaining agent for the entire sales force, to wit, all of the plaintiffs.

(3) No labor dispute of any kind, nor any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, existed between any of the plaintiffs and the company.

(4) None of the plaintiffs has been or now is engaged in any dispute with the company concerning wages, hours, conditions of labor or otherwise. None has been or now is on strike. There has been and now is no discussion or negotiations concerning terms of employment, hours of labor, wages or working conditions. None of the plaintiffs is a member of any of the defendant unions and none of them has any desire or has signified any desire or intention of becoming a member of any of the defendant unions. None of the plaintiffs has been or is now a party to any agreement with any of the defendant unions, or any other labor organziation, and none of the plaintiffs has ever requested any of the defendant unions to act or negotiate for any of the plaintiffs as a permanent agency or otherwise.

(5) All of the defendant unions have rules, regulations, by-laws and agreements enforceable by fines and penalties binding upon their respective members not to pass picket lines or to do business with plants and firms under picket, and said company employs members of all of said associations. The placing of a picket on the company's plant will, pursuant to such by-laws, rules, regulations and agreements,

compel all of the members of each of the unions to abstain from visiting, delivering goods to, accepting goods from, or transacting business with or working for said company.

(6) The Retail Automobile Salesmen's Local Union, No. 1067, has solicited plaintiffs to join the union, but plaintiffs have refused to do so and in consequence of plaintiffs' refusal, the said union has placed a picket around the place of business of the company, the members thereof congregated there in numbers and announced their intention to maintain the picket until the company compels plaintiffs to join said union or discharge them.

(7) The continuance of the picket on the company's plant has closed it down, stopping all work and destroying its business and the company will, unless the defendant union is restrained, discharge all of plaintiffs or require them to join the union. None of the pickets is an employee of the defendant Howard Automobile Company. The Labor Council has approved the picket and has appointed a Board of Strategy to devise ways and means of exerting pressure and coercion on the company and plaintiffs to sign a contract with and join the union, and has placed the company on the "We don't patronize" list.

At the outset, in order to prevent "irrelevant sparring with ghosts" as one of the attorneys herein aptly phrased it, it is essential that we state the issue exactly, definitely and clearly eliminate from consideration all extraneous matters, and avoid the pitfall of assuming to be facts certain assumptions which are wholly unwarranted. It should first be noted that plaintiffs salesmen employees are not unorganized, but are a group of organized employees who have selected three of their number to deal with their employer as their representatives to negotiate rates of pay, wages, hours of labor, and other conditions of employment with the company.

And for the purpose of presenting a precise picture of the situation, it should be pointed out that the unions of craft workers did not strike in order to compel the unionization of the entire Howard plant, but that their refusal to work was merely occasioned by the existence of the picket line which union rules forbade them, under severe penalties, to cross.

It is also to be borne in mind that none of the plaintiffs salesmen is a member of the Retail Salesmen's Local Union,

No. 1067, and that the defendant Retail Salesmen's Local Union, No. 1067, is a total stranger seeking to compel the plaintiffs salesmen employees to join its organization and select it as its representative to negotiate with their employer.

It is also highly important to note that there is absolutely nothing in the pleadings to warrant any assumption that the present organization of the plaintiffs employees is what is called a "company union" or is dominated by the employer. Certainly the allegation that the relations between employer and employees are harmonious and no dispute exists between them with reference to wages, salaries, or hours of employment does not afford any basis whatever for such an assumption. Much of the arguments seeking to justify the union's action in this controversy is based upon the fundamental error of assuming that the present organization is a "company union". As before stated, there is not one iota of reason for such an assumption, and any arguments based thereon are, of course, spurious.

It should also be stated that there are no allegations in the complaint charging the pickets with violence, physical coercion, or intimidation, and hence it must be taken for granted that such picketing has been peaceful.

The sole question involved in this case was phrased by the trial judge as follows: "Is it lawful for a labor union by peaceful picketing to attempt to induce an employer to employ only persons who are members of the picketing union when there is no strike and the employees of the picketed employer are satisfied with their employment and do not desire to join the union?" In one of respondents' briefs, it is stated that the activities of the union are not directed toward the employer, and are not directed toward an effort to induce the employer to do anything, but are directed solely toward "inducing and persuading" the salesmen, who have refused to join the union, to join the union. However, facing facts squarely, the conclusion is inescapable that the activities in which the Retail Automobile Salesmen's Local Union, No. 1067, are engaged are directed toward a coercion of the employer, Howard Automobile Company, to compel the members of its automobile sales force to join the Retail Automobile Salesmen's Local Union, No. 1067. Any other statement of the purpose of such activities is merely an evasion of the

issue. The question may, therefore, be more correctly stated as follows: Is it lawful for a labor union to picket an employer's place of business for the purpose of compelling the employer to coerce his employees to join the picketing union, when the employees are definitely opposed to joining said union, and there is no controversy between the employer and those employees?

While sections 921 and 923 of the Labor Code remain on the statute books in California, the answer, in our opinion, must be in the negative. Section 921 of the Labor Code provides:

"Every promise made after August 21, 1933, between any employee or prospective employee and his employer, prospective employer or any other person is contrary to public policy if either party thereto promises any of the following:

"(a) *To join or to remain a member of a labor organization* or to join or remain a member of an employer organization,

"(b) Not to join or not to remain a member of a labor organization or of an employer organization,

"(c) To withdraw from an employment relation in the event that he joins or remains a member of a labor organization or of an employer organization.

"Such promise shall not afford any basis for granting of legal or equitable relief by any court against a party to such promise, or against any other persons who advise, urge, or induce, without fraud or violence or threat thereof, either party thereto to act in disregard of such promise."

Section 923 of the Labor Code furnished the rule of construction for the interpretation of section 921 and the other two sections which comprise this chapter of the Labor Code. Said section is as follows: "In the interpretation and application of this chapter, the public policy of this state is declared as follows:

"Negotiations of terms and conditions of labor should result from *voluntary* agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman

have *full* freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, *and that he shall be free from the interference, restraint, or coercion of employers of labor,* or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Section 921 (a) of the Labor Code plainly declares a promise by an employee to an employer to join a labor organization or to remain a member of a labor organization to be contrary to public policy. This being so, a boycott or strike or picketing by a labor organization to coerce an employer into an agreement to procure such promise from present and prospective employees becomes an act for the furtherance of an illegal purpose, and therefore properly enjoinable.

Two major arguments are advanced in opposition to this conclusion. The first argument is as follows: Section 921 (a) does not refer to a legitimate *bona fide* trade union but only to the so-called "company union". Therefore, the activity of the union herein being directed toward the securing from an employer of a promise from the employer to compel his employees to join the legitimate *bona fide* labor organization of respondent union does not come within the ban of said section and its activity in that regard cannot be curtailed. This argument is predicated upon the theory that said section is ambiguous and that by an examination of the labor struggle it becomes apparent that the purpose and intent of the legislature was directed solely to increasing the bargaining power of employees with their employers, and hence said section cannot possibly mean that closed shop agreements are unlawful. It is pointed out that for years the so-called "yellow-dog" contract was a source of conflict carried on with great bitterness by organized labor against certain employers. By such an agreement an employee might agree under coercion from his employer not to join a labor union, and such an agreement was held to be binding on the employees. (*Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229 [38 Sup. Ct. 65, 62 L. Ed. 260, Ann. Cas. 1918B, 461, L. R. A. 1918C, 497].) Later employers, being unable to secure such contracts because of the growth of the power of organized labor, sought the same result, domination of their

employees, by setting up and organizing "company unions" which they required their employees to join and over which they kept supervision and control. It is therefore argued that section 921 of the Labor Code was passed solely for the benefit of organized labor and was intended to eliminate both contracts on the part of the employees not to join an organized labor union and contracts to join a "company union". In other words, it is argued that subsections (b) and (c) of this section are directed toward rendering the so-called "yellow-dog" contracts illegal and void, and subsection (a) is directed toward rendering illegal and void, promises secured by employers from their employees to affiliate with "company unions".

We find ourselves unable to subscribe to this argument for three reasons: First: In our opinion the section is not ambiguous, but is plain and explicit and means what on its face it purports to mean. Therefore, no good reason exists for delving into the history of labor disputes in order to give an interpretation to a section contrary to the plain language employed therein. Second: The construction sought by respondents requires that the term, "labor organization" used in subsection (a) of section 921, be limited to and closely defined as "company union" to the exclusion of legitimate *bona fide* trade organizations, whereas the same term, "labor organization" used in subsection (b) of the section, is to be defined as the all-inclusive *bona fide* trade union. Obviously the legislature in using the phrase "labor organization," in several portions of the same section of the code intended that it should have a uniform meaning. To hold the same term within the same section to mean two contrary things seems wholly unreasonable. Such an interpretation does such violence to the ordinary rules of construction as to preclude our acceptance of said argument. Third: The history of the California legislature during the years, 1937, in which the Labor Code was adopted, and in 1939, clearly shows that the legislature, by its action in turning down certain bills proposed by partisans of organized labor, refused to go the lengths claimed here. In 1937, four labor bills were introduced and defeated. In one of these bills, the terms, "labor organization" and "company union", were separately defined. Undoubtedly the legislature had the distinction of these two types of organization in mind, and had it desired or intended

to limit the definition of subsection (a) of section 921 to "company unions", it would have been very simple for it to have so specified. In 1939, four assembly bills and two senate bills were proposed, but did not pass. One of these bills attempted to repeal sections 921 and 923 of the Labor Code, and the other five attempted to add a proviso to the effect that nothing contained in said section 921 should be construed as preventing a *"bona fide"* labor organization from entering into a contract with an employer whereby the employer agreed to employ only members of the said labor organization and to discharge employees, employed after such contract became effective, who did not belong to the said labor organization. In April, 1939, the District Court of Appeal, First District, Division Two, filed its opinion interpreting sections 921 and 923 of the Labor Code as rendering unlawful and therefore enjoinable peaceful picketing directed toward the securing of a closed shop contract with the employer, Howard Automobile Company, covering its salesmen employees, and although the legislature did not adjourn until June, none of these bills which would have given to these code sections the effect claimed for them by the labor union was passed. This clearly demonstrates, we think, that the legislature was in accord with the interpretation given to these sections by the District Court of Appeal, and did not intend that the sections have the construction contended for by the respondent labor union. The fact that the bills were defeated, in our opinion, shows that the legislature definitely repudiated the idea of carrying out labor's demands in their totality, and instead insisted upon declaring the public policy of the state to be freedom of interference for the individual employee from both employer and labor organization domination.

In brief, we are satisfied that said section 921 is not ambiguous, that it means what on its face it plainly purports to mean. The attorney for the labor union states in his brief that, "The whole subject of labor legislation must ultimately be dealt with by the legislature. Its failure to enact appropriate legislation at its last session is no reason now to place an impossible burden on the judiciary." This concession that the legislature failed to pass "appropriate legislation" clearly indicated that organized labor is seeking to obtain an advantage, by judicial construction, which it failed to win in the legislative halls. No doubt when, and if, "appropriate legislation" is passed, this court will be ready to

interpret it to carry out the expressed intention of the legislature. It is, however, outside the scope of our duty and our power to interpret present legislation to carry out the purposes of some *possible* future legislation.

The second argument on which emphasis is placed by the respondents is that the Labor Code sections are directed solely against promises between an employee and his employer, whereas the union-shop contract is a promise by an employer to a union. Respondents assert that section 921 of the Labor Code prohibits contracts between an employer and an employee to join or to remain a member of the labor organization, but not a contract between an employer and a labor organization that all employees of the employer shall be or become a member of a labor organization. In other words, it is respondents' position that it may be unlawful for an employer to coerce an individual employee to join or not to join a labor organization, but it is proper and permissible for the employer to coerce his employees collectively. We think such argument accepts the shadow for the substance. When an employer makes a contract with a union that he will keep no one in his employ except union members, it becomes an implied term and condition of the contract of employment of every individual employee working for him that said individual shall become and remain a member of the union. Such term and condition of employment become a promise of each employee within the prohibition of section 921 of the Labor Code, since section 920 of the Labor Code provides specifically that ''promise'' includes ''promise, undertaking, contract, or agreement, whether written, oral, express or *implied*''.

We do not find any merit in the theory propounded that collective bargaining contracts are not between employees and the employer but are between a labor organization *as a legal entity* and the employer, and therefore the prohibitions of section 921 have no reference to such contracts. There can be no escape from the conclusion that the union, whether a legal entity or not, is an agent for the employees in the execution of the contract of employment and is, therefore, acting in behalf of and for the employees, and its contract is their contract.

Another argument is advanced by respondents that said contracts are not unlawful, but merely unenforceable in law and equity, and, therefore, any coercive attempts by a labor

union to compel such agreements are not illegal *per se* and cannot be enjoined. This argument fails to take into consideration the express words of the statute. The statute definitely and expressly provides that such a contract is ''contrary to public policy''. This fact, in view of section 1667 of the Civil Code which declares contracts contrary to public policy to be unlawful, can mean nothing else than that the contracts prescribed by section 921 of the Labor Code are unlawful, and no amount of ingenious argument can dispel the logic of this conclusion.

The conclusion that section 921 of the Labor Code prohibits the coercion of employees by union activity for the purpose of securing a closed shop is, we think, fortified by the express provisions of section 923 of the Labor Code which declares the public policy of the state with reference to the interpretation and application of section 921. This section states that ''it is necessary that the individual workman have *full* freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives, or in self-organization, or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'' How is it possible in the same breath to reasonably say that an individual workman shall have full freedom of association, self-organization, and designation of representatives of his own choosing, and to say that it is legal and legitimate for any organization by destruction of an employer's business to force the individual workman to join a particular group and assent to a particular representative despite the fact that such workman is bending every effort, even to the extent of appeal for aid to this court, to prevent such coercion? By what process of reasoning, can it be said that the individual workman ''shall be free from the interference, restraint, or coercion of'' his employer, in the designation of a representative, or in self-organization and at the same time that it is perfectly all right for an employer to compel his employees to join a particular union upon threat of discharge and loss of job? The fact that the employer in his turn has been coerced by the labor organization to take such action, does not make such action any the less onerous

to the individual workingman, nor widen his freedom of action in the matter. The idea of freedom for the employee from interference in association and self-organization and the idea of coercion by the union through the employer to secure a closed shop are on their face opposite and antagonistic. One or the other must be dismissed. In view of the fact that the former idea, of freedom of the employee from interference, is embodied in an express statute of the state as an expression of the public policy of the state, and the other is merely a proposition argued by the respondents, there can be no doubt as to which should be given effect by this court.

We have no hesitancy in conceding that prior to the enactment of sections 921 and 923 of the Labor Code strikes, boycotts, both primary and secondary, and pickets were held to be legal in California, and courts refused to enjoin such union activities. (*Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550]; *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324]; *Southern California Iron & Steel* v. *Amalgamated Assn.,* 186 Cal. 604 [200 Pac. 1]; *Lisse* v. *Local Union,* 2 Cal. (2d) 312 [41 Pac. (2d) 314]; *In re Lyons,* 27 Cal. App. (2d) 182 [80 Pac. (2d) 745].) It will also be conceded that in the case of *Parkinson Co.* v. *Building Trades Council, supra,* it was held that union men were within their rights in refusing to work for an employer who refused to sign an agreement, one of the terms of which was that said employer would only employ union men. However, at the time of that decision both an agreement not to join or not to remain a member of a labor organization (so-called "yellow-dog contract") and a promise to employ only union labor or remain a member of a labor organization (the closed union shop agreement) were legal. This situation has been reversed by the express terms of sections 921 and 923 of the Labor Code, and since the enactment of these sections, these decisions are no longer controlling.

It may also be conceded that certain decisions of the United States Supreme Court, both in interpreting federal legislation with reference to labor problems and state statutes based on such federal legislation, have given official sanction to picketing for the unionization of a nonunion shop. (*Senn* v. *Tile Layers Protective Union,* 301 U. S. 468 [57 Sup. Ct. 857, 81 L. Ed. 1229]; *Lauf* v. *E. G. Shinner & Co.,* 303 U. S.

323 [58 Sup. Ct. 578, 82 L. Ed. 872].) These cases have been cited as persuasive in their reasoning of the interpretation to be given to sections 921 and 923 of the California Labor Code. In order to understand the inapplicability of such authorities, certain underlying facts with reference to the similarity and dissimilarity of the California Labor Code with federal legislation, such as the National Labor Relations Act, 29 U. S. C. A., sec. 151 et seq.; 49 Stats. 449, and the Norris-La Guardia Act, 29 U. S. C. A., sec. 101 et seq.; 47 Stats. 70, and other state statutes, such as the Wisconsin Labor Code and the Oregon Act, should be outlined. A mere statement of the dissimilarity will suffice to show why the federal cases, cited by respondents in support of their contention that peaceful picketing for the purpose of the unionization of a plant and the securing of a closed shop is legitimate union activity, are not only not controlling in this jurisdiction but can have no persuasive effect by virtue of their reasoning. The major fundamental difference is that the California legislature definitely and deliberately rejected labor bills patterned on the Norris-La Guardia Act. The main feature of the Norris-La Guardia Act is the fact that it defines ''labor dispute'' to involve practically any dispute in the labor field regardless of whether or not the disputants stand in the relation of employer and employee, and forbids (except under certain limited conditions) the issuance of an injunction by a federal court in any case involving or growing out of a labor dispute. Clearly a dispute by an employer with an outside union over the unionization of his shop comes within such definition of ''labor dispute''. Hence in interpreting said act, or state acts which were practically identical, the United States Supreme Court was justified in holding that an injunction could not be issued in a controversy involving an employer and a labor union over the question of a closed shop. (*Senn* v. *Tile Layers Union, supra*; *Lauf* v. *E. G. Shinner & Co., supra.*) Both of these cases involved the interpretation by the State Supreme Court of Wisconsin of a statute similar to the Norris-La Guardia Act, which defined a ''labor dispute'' as ''any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of

the respective interests of employer and employee, *regardless of whether or not the disputants stand in the proximate relation of employer and employee"*. In both these cases the United States Supreme Court held that it was bound by the decision of the Supreme Court of the State of Wisconsin in its decision that the facts presented a controversy within the definition of "labor dispute" contained in the Wisconsin Act. Both the Norris-La Guardia Act and the Wisconsin Act contain a statement of public policy very similar to the declaration of public policy contained in section 923 of the Labor Code of California, to the effect that it is necessary that the individual worker "have full freedom of association, self-organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives, or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection". In the case of *Lauf* v. *E. G. Shinner & Co.*, 82 Fed. (2d) 68, the Circuit Court of Appeals, Seventh Circuit, having in mind the expressed public policy of the Wisconsin Act, gave precedence to such policy, and held that inasmuch as the union activity therein involved interfered with the individual workingman's freedom of association, self-organization and designation of representatives of his own choosing, such activity was unlawful and was properly enjoinable. Upon appeal to the Supreme Court of the United States, that court held that the general declaration of public policy could not narrow the definition of "labor dispute" as defined in the Norris-La Guardia Act or enlarge the federal jurisdiction to issue an injunction in cases prohibited by such act. In other words, the United States Supreme Court, merely by saying so, gave precedence to the express provisions of the Norris-La Guardia Act defining "labor dispute" over the provision setting forth generally the public policy of said act, and held that a "labor dispute" being involved in the controversy an injunction by a federal court was not proper. Thus it is seen that the broad definition of "labor dispute" has colored and controlled the decisions of the United States Supreme Court which hold that an injunction may not be sought and secured in a federal court to enjoin union activities directed against

an employer having as its purpose the securing of a closed shop.

California, by refusing to enact in its own legislation the definition of ''labor dispute'' which defines such dispute to include any and every possible controversy in which a labor question can be conceived, must be held to have rejected such definition and refused to sanction the taking away from our courts of power to issue injunctions in any and all disputes in which a labor question so broadly defined is involved, thus affirming the existing law in which ''labor dispute'' was defined as a controversy in which the disputants stood in the relation of employer and employee.

Therefore, while it may readily be conceded that certain decisions of the United States Supreme Court have given official sanction to picketing for the unionization of a closed shop under the broad definition of ''labor dispute'' as defined in the Norris-La Guardia Act, and kindred state statutes, it is readily apparent that such decisions, in the absence of such a definition in the California Labor Code (which was expressly rejected by the California legislature), can have no weight in determining what effect this court should give to sections 921 and 923 of the California Labor Code. Moreover it is worthy of note that in 1939 both Wisconsin and Oregon reversed their position and redefined ''labor dispute'' in much narrower terms. (Wisconsin, Laws of 1939, chap. 25; Oregon, Laws of 1939, chap. 2.)

Likewise we have no hesitancy in admitting that the principle that a closed union shop is a proper object of concerted action by unions has been recognized in some other jurisdictions. It should also be pointed out, however, that other states have rejected this principle and in well expressed opinions have given their reasons for this rejection. (See *Safeway Stores* v. *Clerks' Retail Union*, 184 Wash. 322 [51 Pac. (2d) 372]; *Swing* v. *American Federation of Labor*, 372 Ill. 91 [22 N. E. (2d) 857]; *Fornili* v. *Auto Mechanics Union*, 200 Wash. 283 [93 Pac. (2d) 422]; *Roth* v. *Local Union*, (Ind.) 24 N. E. (2d) 280; *Meadowmoore Dairies, Inc.*, v. *Milk Wagon Drivers Union*, 371 Ill. 377 [21 N. E. (2d) 308]; *Stalban* v. *Friedman*, 171 Misc. 106 [11 N. Y. Supp. (2d) 343]; *Hotel, Restaurant and Soda Fountain Employees Local Union No. 181* v. *Miller*, 272 Ky. 466 [114 S. W. (2d) 501].) In the case of *Hotel, Restaurant and Soda Fountain Employees Local Union No. 181* v. *Miller, supra,* the employer Miller sought and secured an

injunction against the picketing activities of a union, affiliated with the American Federation of Labor, which was attempting by such activities to secure a closed shop agreement from him, after his employees had refused to join the union. The language employed therein is, we think, pertinent to the instant case: ''Labor has become highly organized with central federated unions and active locals of great influence and power. Such is the appellant. But to say that in the matter of bargaining with employers for the advancement of the causes of labor these organizations are to be given exclusive recognition by the courts, it seems to us, would destroy the independence of any group of workers who may desire to choose for themselves whom they will have as their agents to treat with their employer, and violate their liberty of action in contracting with their employer. This right of self-organization for the purposes of securing redress of grievances and the protection from economic abuse and other impositions is recognized by contemporary legislation and judicial decree. It is current history that the Railway Labor Act of 1926, c. 347, 44 Stat. 577, with the amendment of 1934, c. 691, 48 Stat. 1185, 45 U. S. C. A., sections 151–163, and the National Labor Relations Act of 1935, commonly called the Wagner Act, 49 Stat. 449, c. 372, 29 U. S. C. A. sec. 151 et seq., were enacted by Congress at the instance and for the benefit of organized labor. Those laws, obviously, have no relation or application to the case at bar. But they and the opinions of the Supreme Court affirming their constitutionality and interpreting their provisions may be regarded as an authoritative expression of modern economic philosophy. The Wagner Act itself declared it to be the policy of the United States to encourage the practice and procedure of collective bargaining and to protect 'the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection'. Section 1, 29 U. S. C. A. section 151.

''As stated in *National Labor Relations Board* v. *Jones & Laughlin Steel Corporation* (301 U. S. 1 [57 Sup. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352]), *supra,* the Wagner Act, 29 U. S. C. A., sec. 151 et seq., imposes the duty upon an employer coming within its reach to confer and negotiate with

such authorized representatives of his employees for the purpose of settling a labor dispute. Though there is no law making negotiations by the appellee Miller with any group obligatory, or imposing a duty upon him to deal with either the appellants or the independent organization, he has chosen to deal and to agree with the latter, and all parties are satisfied. By what right can it be said that a rival organization— even though extensive in its reach and strong in its operation —should be given sole recognition by the employer or by the courts to speak for and to bind those who do not belong to it and do not wish to belong to it?"

Finally it is urged that if sections 921 and 923, as interpreted, prohibit closed shop contracts, they are unconstitutional. The first ground suggested is that they are unconstitutional as a deprivation of freedom of contract. There is little, if any, merit in this contention. It is well recognized that the freedom of contract does not guarantee to a citizen the right to contract without abridgement or interference by any legislative authority. Such right is subject to control and regulation under the police power by means of legislation reasonably adapted to the protection of the public health, safety, morals and general welfare. (*West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 [57 Sup. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330], wherein the United States Supreme Court upheld the statute of Washington establishing a minimum wage law for women.) That case quoted with approval the following statement of this rule: "It was recognized in the cases cited . . . that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. (*Chicago, B. & Q. R. Co.* v. *McGuire,* 219 U. S. 549, 567 [31 Sup. Ct. 259, 55 L. Ed. 328].)" Much of the legislation proposed and promoted by organized labor such as the Norris-La Guardia Act and the National Labor Relations Act could be equally well challenged on this ground.

To the argument that this legislation is discriminatory in that legislation in other fields of industrial enterprise, such as contracts for the exclusive handling and sale of certain products are not frowned upon, it may be said that there is clearly a difference between exclusive sale contracts for the sale of Buick automobiles, for instance, and a contract for the exclusive employment of union men, even though both contracts be secured by economic competition. In the former case, the subject-matter of the contract is inanimate and possesses no rights which need be given consideration. There are in reality only two parties to the contract. In the latter case, in a contract between an employer and a labor union with reference to employment conditions, there is the third party, the employee, who has definite rights which must not be ignored. It is the rights of these employees which furnish the justification for the legislation.

Equally without merit is the contention that this legislation deprives the unions of their constitutional right to strike. The proposition that an individual, in the absence of a contract, can work or refuse to work as he sees fit must be distinguished from the right of the union to call a strike or the right of individuals, collectively or by agreement to refuse to work. The right to strike is not absolute for if the strike is for an unlawful purpose that strike itself is unlawful (*Dorchy* v. *Kansas*, 272 U. S. 306 [47 Sup. Ct. 86, 71 L. Ed. 248]). Moreover in the instant case the appellants are not seeking an injunction against a strike as it is one of their contentions that a strike is not in existence at the plant and that the other workers at the Howard plant have not gone on a strike but have simply refused to pass the picket line which was established by the respondent labor union. In one of their briefs, appellants expressly disclaim any desire to secure an injunction against a strike.

Neither can we subscribe to the argument that the construction which we have put upon sections 921 and 923 of the Labor Code deprives the union of the right of free speech. This contention rests upon the proposition that picketing in and of itself is but the right of free speech and that the right to picket is no more than an exercise of free speech. However, as pointed out in an article by Charles O. Gregory, professor of law, University of Chicago Law School, which was published in the American Bar Association Journal, volume 26,

page 709 (September, 1940), a fundamental fallacy exists in the denomination of peaceful picketing as an expression of free speech and identification of peaceful picketing with business advertising. In said article it is stated that freedom of speech historically deals with the unrestricted dissemination and communication of ideas, chiefly concerning political and economic issues and that "our system of government is committed to the faith that the good sense of our populace is the best defense against the effusions of crackpots or against the more rigorous claims and propaganda of disciples representing undesirable political or social folkways". It is pointed out that in the United States labor organizations have always been allowed to talk, no effort ever having been made to prevent them from discussing their programs as freely as they choose. The article then points out that peaceful picketing resting as it does, not on the dissemination of ideas but on its coercive effect, is not entitled to the constitutional protection and for the sake of the welfare of our country private group pressure should not be removed from the sphere of legislative regulation. The thought that peaceful picketing may not correctly be deemed to be merely an expression of free speech is well stated in the following quotation from said well-reasoned article:

"The claim that such coercive union practices are justifiable as constitutional freedom of speech and are merely the exercise of ordinary civil rights available to all is a perversion of an American ideal which betrays an odd understanding of one of this country's most precious heritages. . . . Now if freedom of speech is to prove a valuable social asset, it will be because unrestricted expression *educates and convinces others intellectually*. It is submitted that peaceful picketing is not an argument intended to achieve an intellectual conquest. It is a type of coercion. The only intellectual conviction to which it leads is the understanding that if the picketed enterprise does not give in, or if patrons or applicants for jobs do not cease dealing with him, they will all eventually wish they had.

"True liberals in this country no longer look askance at economic compulsion. But to call such coercion constitutionally guaranteed freedom of speech, thereby placing it beyond the reach of regulatory legislation deemed practicable by the majority seems ridiculous policy and sheer misunderstanding of the concept under discussion. Let the unions

employ all manner of persuasions (as contrasted to coercion) and call that freedom of speech. But when they insist upon 'expressing' themselves where everyone knows that their 'arguments' win, not because of any intellectual worth but chiefly because of annoyance and fear, they strain the concept beyond all sensible meaning. . . .

"Unless we wish to live in a society where all enterprise and all social activity, however private, is subjected to the coercive influence of annoyance and fear created by some conflicting group interest or prejudice, we had best save for our legislature the means of effective regulation of private group pressures which the founding fathers no doubt intended to include in the Constitution."

In the instant case by reason of the fact that no member of a union affiliated with the American Federation of Labor will go through a picket line thrown about his place of employment by another union also affiliated with the American Federation of Labor, the picketing has resulted in a complete shutdown of the employer's place of business. When picketing has this coercive effect, it is clearly not merely an expression of free speech and cannot correctly base its claim to a right to so picket upon the constitutional guarantee of free speech.

Throughout the discussion of respondents is the underlying thesis that its actions in this particular have been motivated by the desire to further the best interests of workingmen in general and to promote a higher social order, and in this regard it insists that its actions are justified in the instant case upon the ground that a closed shop is an important means of maintaining the combined bargaining power of the workers. Assuming that closed shops are for the best interests of workingmen in their negotiations with their employers, as their bargaining power is greater, nevertheless, it would appear that there are certain fundamental rights, important to workingmen as individuals, which are so important as to outweigh any advantage of a closed shop procured by coercive activities. One of these rights is the right of an individual to ally himself with a group of his own seeking, and to select a representative for negotiations with his employer in whom he has faith and confidence. To have forced upon him membership in an association to which he is antagonistic, and to have imposed upon him as a representative, an agency which he does not desire, is so violative of his

freedom of action and his liberty as an individual as to need no apology for the defense of these rights, and to justify the enactment by the legislature of a statute intended to preserve these rights to him. We cannot but believe that the rights of an individual as a citizen, are as highly important to him as his rights as a member of a social class, and should be as carefully preserved.

Nothing herein said can or should be construed as antagonistic to the principle of collective bargaining which has come to play an important part in our industrial life. However, we are convinced that the growth of the labor union has been based upon the principle of voluntary association of workers and not upon the domination of one group of workers over another group by coercion, and that insistence upon such voluntary association will in the long run work to the benefit rather than the detriment of organized labor.

Moreover, we can see no escape from the industrial war with its resulting injury to business and to individual workingmen between two or more warring factions of organized labor, as for instance, unions affiliated with the American Federation of Labor and the Congress of Industrial Organization unless the individual worker be permitted to choose the particular group with which he wishes to affiliate, and that his right to do so be protected and upheld. (*Crosby* v. *Rath,* 136 Ohio St. 352 [25 N. E. (2d) 934].)

In addition to the foregoing discussion with reference to the effect of the law of this state as laid down in the Labor Code, it may also be said that this same regulation provided by the federal government in the National Labor Relations Act (49 Stats. 449) should apply in behalf of the union of which the plaintiffs are members. It appears from the allegations of the complaint, and cannot be disputed, that the plaintiff employees are under the jurisdiction of the National Labor Relations Board. The Howard Automobile Company as their employer is engaged in interstate commerce and is likewise subject to the operation of the federal act. Under that act such an employer is forbidden to interfere in any way with the union affiliations of his employees. The employer, in this case, the Howard Automobile Company, is proscribed by the federal act from even suggesting to its employees, the plaintiffs herein, that they join or do not join a union. Yet if the judgment in this case is to stand, that company must submit to activities on the part of the de-

fendant unions, the result of which is to compel it to require its employees to join the picketing union or be discharged from their employment. If the company refuses to accede to the demand of the picketing union to violate the federal law it must suffer the loss of its business. If the company violates that law, as demanded by the picketing union, it is punishable thereunder. Such a result is not only contrary to the letter and spirit of the statutory law, but is also contrary to the "cherished judicial tradition embodying the basic concepts of fair play". (*Morgan* v. *United States*, 304 U. S. 1, 22 [58 Sup. Ct. 773, 778, 999, 82 L. Ed. 1129].) Such an interpretation placed on the law makes of it a weapon of coercion and intimidation to be wielded at the whim and caprice of a group not possessed of legislative authority and not subject to any legal control or restraint.

Furthermore, the plaintiff employees have the right of self-organization guaranteed to them by the federal act. (*National Labor Relations Bd.* v. *Swank Products,* 108 Fed. (2d) 872, 874; *National Labor Relations Bd.* v. *Sterling Electric Motors,* 109 Fed. (2d) 194.) Section 1 of that act was designed to protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection". As before stated, there is nothing in the record herein to indicate that the plaintiffs' union was not organized in good faith. There is nothing whatsoever in the record upon which to base such a conclusion. The right of the plaintiff employees to organize their own union and to select their own bargaining representatives is recognized, by both state and federal law.

The picketing which the plaintiff employees are here seeking to enjoin is contrary to their rights under both laws, is therefore picketing for an unlawful purpose, and as such should be subject to the injunctive processes of the courts of this state.

It is apparent that the trial court erred in sustaining the demurrer to the complaint and in dissolving the temporary restraining order.

The judgment should be reversed.

Shenk, J., concurred.

MARKS, J., *pro tem.*, Dissenting.—I dissent.

I agree with the conclusion reached in the opinion prepared by Mr. Justice Curtis and with much of the reasoning and arguments there set forth. I believe that the concession that the picketing described in the complaint can be classified as "peaceful picketing", requires further examination. While my reasoning follows closely that of Mr. Justice Curtis in most important particulars, there are certain departures and some additional reasons and authorities that I wish to particularize.

I have two points of departure from the majority opinion:

First, it was not necessary for the plaintiffs to allege that they had "organized a *bona fide* independent labor union". They alleged that they were all of the salesmen of the employer company and had "united and organized and designated three of their number a committee to negotiate rates of pay", etc., and that such committee had been recognized as bargaining agent for the entire sales force, being all the plaintiffs. These allegations follow the language of sections 921 and 923 of the Labor Code.

Second, the language used in the sections of the Labor Code just referred to is too simple and clear, the intent of the legislature in using that language is too plain to permit of judicial interpretation. Under such circumstances the courts must accept the language used by the legislature and give to it the usual, common and accepted meaning of the words employed. This being true, there is no room for judicial interpretation or speculation as to what the framers of the measure might have intended to accomplish by the legislation. The intent is clear from the act. Amendment of the act should be left to the legislature. It should not be accomplished by judicial legislation.

In considering these questions it should be observed that the word "union" or the words "labor union" do not appear in either of the three sections. It is there declared to be the public policy of the state to protect the individual worker in his "freedom of labor, and thereby to obtain acceptable terms and conditions of employment . . . that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment . . . "

This statute was followed in the allegations of the complaint. The pleading therefore should be sufficient to support the conclusion that the plaintiffs had formed and joined an organization of their own forming and choosing and had selected and designated their own bargaining representatives to negotiate with the employer the terms and conditions of employment. This is all the statute requires. The courts should demand no more.

A demurrer admits the truth of the allegations of a complaint. It adds nothing to those allegations nor does it subtract from them. The question of the issuance of an injunction was also submitted on the undenied allegations of the complaint, the truth of which were thus admitted.

The complaint here contains nothing that would in the slightest degree intimate that plaintiffs' organization was company inspired or company controlled. It would be purest speculation without any foundation of allegation or inference from any allegation for me to assume that the organization was dominated by the employer. Such influence or domination by the employer is prohibited by the Labor Code and is unlawful. The presumption "that a person is innocent of crime or wrong" (sec. 1963, Code Civ. Proc.) is a sufficient answer to any such speculation should I desire to indulge in it.

I am thus brought to the point where I must conclude from the allegations of the complaint that plaintiffs voluntarily and lawfully formed their own organization and freely selected their own bargaining agents to negotiate the terms of their employment. This they had the right to do under the statute. In the lawful exercise of this right they should be protected.

The last paragraph of the first section of the National Labor Relations Act of 1935 (29 U. S. C. A., sec. 151) declares it to be the policy of the United States to eliminate certain obstructions to the free flow of commerce "by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection". This language is so similar to that used in section 923 of our Labor Code in declaring the public policy of California that the construction of the federal act by the Supreme Court of the

United States should be most persuasive here. In *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 [57 Sup. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352], it was said:

"Thus, in its present application, the statute goes no further than to safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer.

"That is a fundamental right. Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent legislative authority. Long ago we stated the reason for labor organizations. . . .

"We reiterated these views when we had under consideration the Railway Labor Act of 1926, 44 Stat. 577. Fully recognizing the legality of collective action on the part of employees in order to safeguard their proper interests, we said that Congress was not required to ignore this right but could safeguard it. Congress could seek to make appropriate collective action of employees an instrument of peace rather than of strife. We said that such collective action would be a mockery if representation were made futile by interference with freedom of choice. Hence the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, 'instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both'. (*Texas N. O. R. Co.* v. [*Brotherhood of*] *Railway & S. S. Clerks,* 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034.) We have reasserted the same principle in sustaining the application of the Railway Labor Act as amended in 1934 (45 U. S. C. A., sec. 151 et seq.). (*Virginian Railway Co.* v. *System Federation, No. 40,* 300 U. S. 515, 57 S. Ct. 592, 81 L. Ed. 789.)"

There can be no doubt of the right of the workingman to organize for his own protection and betterment. There is the eminent authority I have quoted, besides the statute, for the conclusion that the exact form such organization takes

is immaterial. It may take the form of the closely knit craft union, the larger industrial union or the loose organization of workers for the purpose of selecting bargaining agents such as we have here. The statute so specifies. (Sec. 923, Labor Code.)

Having concluded that plaintiffs' organization is legal and their membership in it a matter of lawful right, it is necessary to consider the effect of the judgment on plaintiffs and their organization under the allegations of the complaint. No court should by judgment force the dissolution of a lawful organization. Neither should it force individual members to forfeit membership in one lawful organization and to join another if such action be against their will and without their consent. Freedom of individual action within lawful limits is a fundamental principle of our government.

It is alleged that plaintiffs are all the salesmen employed by their employer; that they compose all of the membership of their organization; that none of them desires to become a member of any of the defendant unions which are maintaining the picket line; that defendant Salesmen's Union has solicited each of the plaintiffs to join that union; that each plaintiff has refused to do so; that a picket line has been placed around the employer plant; that the picket line will be maintained until the employer "compels plaintiffs to join said union or discharges said plaintiffs"; that unless the picketing be restrained the employer "intends to, and . . . will discharge all the plaintiffs from their said employment, or demand that plaintiffs and each of them join the said union". It is also alleged that the picket line "has had the effect of closing down the said plant, (and) stopping all work therein . . . ".

These allegations must be accepted as true as the demurrer admits their verity and the case was not tried on its merits. But one conclusion can be drawn from them, namely, that unless they be enjoined the defendant unions will compel plaintiffs to forfeit memberships in their own organization and to join the defendant Salesmen's Union; that as a penalty for failing so to do they will forfeit their employment; that as a condition of future employment the employer will be compelled to require plaintiffs to belong to that union,—all this against the will and without the consent of plaintiffs.

Thus the case resolves itself into a jurisdictional dispute between labor organizations,—that of the plaintiffs small and weak numerically and those of the defendants, strong in numbers and powerful in influence.

A fundamental concept of our government always has been and always should be the protection of the lawful rights of minorities,—protection of the weak against the strong. Mere might should never make right. Mere force of numbers should never prevail over or be allowed to destroy the lawful rights of the few. Volumes have been written both in and out of the courts supporting this thesis. It should be unnecessary to cite any supporting authority other than the words of Thomas Jefferson when he wrote:

''We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.—That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.''

In this case these principles may be violated. On the face of the record they will be violated. If this order be sustained it might not be inappropriate to ask what would happen to a numerically small craft union when confronted in a jurisdictional dispute with a stronger industrial union. There is a procedure to determine the equities under the law in such a case as this. The restraining order should be continued until the parties are put on their proof. Evidence should be taken and weighed by a court. Not until that is done should the grave questions here presented be decided with the complaint containing the allegations presenting these serious problems.

Also it might not be inappropriate to ask what is to become of our constitutional guarantees, both federal and state, of equal protection of the laws if plaintiffs are forced to surrender their lawful membership in their own lawful organization and take membership in a defendant union without their will and against their consent?

Is it not true, as said by the Supreme Court of the United States, in the National Labor Relations Board case, *supra*, ''that such collective action would be a mockery if representation were made futile by interference with freedom of choice'' when referring to employer interference? How much more

true are those same words when applied to like interference by orders of the courts, reinforced as they are by all the powers of the state?

It has been repeatedly held that the right of a man to sell his labor is a property right that is protected by the Constitution. It is also equally well settled that this right to sell his labor is limited by the language of the rule. It does not guarantee the right of a man to labor either as a union or a nonunion worker. It is merely the right to work that is guaranteed.

However, these rules should not control the decision here. While the right of plaintiffs to labor at all is involved, the immediate question is the right to force lawful members of one lawful organization of laborers to forfeit their membership in that organization and to join another lawful organization of laborers, all against their will and without their consent. If this end should be accomplished it would deny to plaintiffs and their organization the equal protection of the laws.

I have found no reported case in California even touching upon what I conceive to be the real question involved here,— the right to force members of one lawful organization of laborers to forfeit their membership in that organization and take membership in another labor organization. The question seems to be of first impression here.

The case of *Greenwood* v. *Building Trades Council*, 71 Cal. App. 159 [233 Pac. 823], is not even remotely related to that question. That case involved the right of Local Union No. 162 of the Sheet Metal Workers, a voluntary association, to membership and representation in the Building Trades Council of the city of Sacramento, a voluntary association,—and the collection of *per capita* dues. The real rule applied to settle the controversy in that case is thus stated in the opinion of the District Court of Appeal:

"In 3 California Jurisprudence, 350, section 5, the rule as to membership is stated as follows: 'Membership in a voluntary association is not a right which can be gained independently and then enforced. It is rather a privilege which may be withheld, or accorded on such terms and conditions as the association sees fit to impose . . . ' . . . We have not been cited to any authority holding that the courts have any power to enforce the admission of members; the only rule

which we have discovered is that which we have quoted from 3 California Jurisprudence.''

A new factor has been injected into cases of this kind by the adoption of sections 921, 922 and 923 of the Labor Code and similar earlier statutes on which those sections are founded. Those statutes have been enacted recently and render earlier decisions inapplicable to the legal situation here presented. Those earlier cases can only be relied upon now for the announcement of principles which do not conflict with the public policy of California as declared in these sections.

It is clear to me that the Labor Code now declares that it is the public policy of California to permit workmen, regardless of their numbers, to freely organize for the purpose of selecting their own bargaining agents to bargain with their employer concerning the terms of their employment; that in the exercise of this right the workers must be free from domination, intimidation or coercion. The constitutionality of an enactment having such purpose and effect may not now be questioned. (See *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra*; *Senn* v. *Tile Layers Protective Union, Local No. 5*, 301 U. S. 468 [57 Sup. Ct. 857, 81 L. Ed. 1229].) There are many other cases supporting this conclusion.

It is very generally held that an act lawful in itself does not become unlawful because it was prompted by a bad motive; that ''he who does what the law allows cannot be a wrongdoer whatever his motive''. (*Union Labor Hospital Assn.* v. *Vance Redwood Lumber Co.*, 158 Cal. 551 [112 Pac. 886, 33 L. R. A. (N. S.) 1034].)

It is also held that in labor disputes where an act lawful in itself has as its object the accomplishment of a result prohibited by law, the act becomes unlawful. This was recognized by Mr. Justice Frankfurter when he wrote in 44 Quarterly Law Review at page 182: ''The damage inflicted by combative measures of a union—the strike, the boycott, the picket—must win immunity by its purpose''. That an unlawful purpose makes a strike illegal was established by the Supreme Court of the United States in *Dorchy* v. *State of Kansas*, 272 U. S. 306 [47 Sup. Ct. 86, 71 L. Ed. 248], where, in speaking through Mr. Justice Brandeis, it said:

''The right to carry on business—be it called liberty or property—has value. To interfere with this right without

just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted." (See, also, *Senn* v. *Tile Layers Protective Union, Local No. 5, supra; Overland Pub. Co.* v. *H. S. Crocker Co.,* 193 Cal. 109, at p. 119 [222 Pac. 812].)

In addition to the provisions of section 923 of the Labor Code to which we have already adverted, section 921 of that code interdicts any contract between an employer and employee "To join or to remain a member of a labor organization",—"not to join or not to remain a member of a labor organization",—"to withdraw from an employment relation in the event that he joins or remains a member of a labor organization".

A fair construction of the allegations of the complaint requires me to conclude that the picket line established by the defendant union seeks to accomplish the following results: to compel the employer to require plaintiffs to surrender membership in their organization (a reasonable inference from the allegations of the complaint); to compel plaintiffs to join and remain members of defendant Retail Automobile Salesmen's Local Union, No. 1067; or as an alternative to require plaintiffs to withdraw from their employment relationship with their employer. Each one of these purposes is made unlawful by the Labor Code. It should follow that the picket line, by seeking to accomplish unlawful results, is itself unlawful and that its maintenance should be enjoined, assuming the truth of the allegations which we must do at this stage of the proceedings.

Weight is lent to this conclusion by the cases of *Texas & New Orleans Railroad Co.* v. *Brotherhood of Railway & Steamship Clerks,* 281 U. S. 548 [50 Sup. Ct. 427, 74 L. Ed. 1034], and *Consolidated Edison Co.* v. *National Labor Relations Board,* 95 Fed. (2d) 390, where employers were enjoined from committing some of the very acts which the picket line in the instant case sought to compel the employer here to commit.

Another new and novel question unapproached in any reported California case is presented by the allegations of the complaint, namely, is the picketing there described peaceful? This question is entirely unrelated to the others I have considered and can in itself be decisive of this appeal. It re-

volves around the question of what is *peaceful picketing*. Does this term only exclude acts or threats of physical injury or violence or does it also exclude conduct which amounts to mental and moral intimidation and coercion whereby the mind and will are overcome by fear of the consequences resulting from failure to yield to pressure?

It is thoroughly established and admitted that only peaceful picketing is lawful,—that picketing which is not peaceful is not lawful and should be enjoined. The authorities cited in the prevailing opinion fully sustain this rule.

The complant alleges that the defendant unions "all have rules, regulations, by-laws and agreements enforceable by fines and penalties binding on their members respectively, not to pass picket lines or to do business with plants or firms under picket; that said company employs members of each and all of said associations; that the placing of a picket on the plant of said company will, pursuant to said by-laws, rules, regulations and agreements, compel each and all the members of each and all of said associations to abstain from visiting, delivering goods to, accepting goods from, or transacting business with or working for said company". The briefs admit that all of the workmen employed in the plant except plaintiffs are members of the defendant unions. It is also alleged that "the continuance of said picket on the plant of said company has had the effect of closing down the said plant, stopping all work therein, and destroying its said business, . . . None of said pickets have been or are employees of said company, on strike or otherwise." These allegations present the question I wish to consider, namely, can the picketing described in the complaint with the serious penalty to be imposed on union workmen for passing through the picket line be held to be peaceful?

Peace is often defined as the absence of any force. Force may be applied to the mind as well as to the body. The use of force may result in the lack of freedom of movement and action. This may result just as truly from coercion of the mind as restraint of the body. This court has recognized these truths and has held that mere intimidation and coercion of the mind is just as effective an application of force as is physical violence or restraint.

In *Southern Cal. etc. Co.* v. *Amalgamated Association of Iron, Steel and Tin Workers*, 186 Cal. 604, at page 611 [200 Pac. 1], this court said;

" 'Any act of boycotting, therefore, which tends to impair this constitutional right freely to labor, by means passing beyond moral suasion, and playing by intimidation upon the physical fears, is unlawful.' (See, also, *Goldberg etc. Co.* v. *Stablemen's Union*, 149 Cal. 429, [117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460, 86 Pac. 806] ; *Berger* v. *Superior Court*, 175 Cal. 719 [167 Pac. 143 (15 A. L. R. 373)] ; *Rosenberg* v. *Retail Clerks' Assn.*, 39 Cal. App. 67, [177 Pac. 864] ; *Moore* v. *Cooks' etc. Union*, 39 Cal. App. 538, [179 Pac. 417] ; *American Steel & Wire Co.* v. *Wire Drawers' etc. Unions*, 90 Fed. 608; *Union Pacific R. R. Co.* v. *Ruef*, 120 Fed. 102; *Atchison, Topeka & S. F. Ry. Co.* v. *Gee*, 139 Fed. 582; *Kolley* v. *Robinson*, 187 Fed. 415, [109 C. C. A. 247] ; *Franklin Union* v. *People*, 220 Ill. 355, [110 Am. St. Rep. 248, 4 L. R. A. (N. S.) 1001, 77 N. E. 176] ; 4 L. R. A. [N. S.] 302, note.)

"We quote from Martin on Labor Unions, page 229: 'The use of force and violence is not necessary to make picketing unlawful. Intimidation is not limited to threats of violence or to physical injury to person or property. It has a broader signification, and there may also be a moral intimidation which is illegal. In the guise of picketing strikers may obstruct and annoy others and by insult and menacing attitude intimidate them as effectually as by physical assault.' "

The same rule was restated in *Lisse* v. *Local Union No. 31*, 2 Cal. (2d) 312 [41 Pac. (2d) 314], as follows:

"In this regard it is held that in order to prove physical intimidation and fear it is not necessary to show that there was actual force or express threats of physical violence used, that such result may be accomplished as effectually by obstructing and annoying others and by insult and menacing attitude as by physical assault. (*Southern Cal. Co.* v. *Amalgamated Assn.*, supra; *Jordahl* v. *Hayda*, 1 Cal. App. 696 [82 Pac. 1079] ; Martin on Labor Unions, p. 229.) In so holding the Supreme Court in the case of *Southern Cal. Co.* v. *Amalgamated Assn.*, supra, in quoting approvingly from another case (*Allis-Chalmers Co.* v. *Iron Molders Union*, 150 Fed. 155, 173), said that 'intimidation includes persuasion by or on behalf of a combination of persons resulting in coercion of the will from the mere force of numbers'; and the court then points out that the same rule is declared in Martin on Labor Unions, supra, as follows: 'Even a simple "request" to do or not to do a thing, made by one or more

of a body of strikers under circumstances calculated to convey a threatening intimidation, with a design to hinder or obstruct workmen, is unlawful intimidation, and not less obnoxious than the use of physical force for the same purpose.' The rule is applied with equal force as to customers and patrons. (*Goldberg, Bowen & Co.* v. *Stablemen's Union, supra.*)''

Here there is alleged the force of the rule which was applied by the picket line to all union employees working in the employer plant. The rule brought into effect by the picket prohibited union members from crossing the picket line. It imposed severe penalties on them should they violate the rule. The fact of the picket line brought that rule into play. The rule was the force applied by the picket line. The result of that force was alleged. No union member crossed the line. The plant was completely ''knocked out''. A barricade manned by men could not have been more effective. I cannot distinguish between the mental and moral intimidation of the rule applied by the picket line and the physical intimidation of actual threats or actual violence. The results were the same, or perhaps more effective in the case of the rule and the picket line. Physical force may arouse such resentment that it may be met with like physical force. The intimidation and coercion of the rule and the picket line were so complete that no employee sought to cross the line.

It is instructive and very persuasive to study four decisions by this court in which injunctions against picketing that were approved or modified and approved are set forth in full. The injunctions actually approved and issued should be conclusive evidence of this court's opinion of the powers it should exercise in picketing cases.

In *Goldberg etc. Co.* v. *Stablemen's Union*, 149 Cal. 429 [86 Pac. 806, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460], the judgment, as amended by this court, enjoined the defendant union and its pickets from interfering with or harassing or obstructing plaintiff ''by means of pickets or transparencies, or otherwise, threatening or intimidating any person or persons . . . being employed at said place or places by the plaintiff''.

In *Pierce* v. *Stablemen's Union*, 156 Cal. 70 [103 Pac. 324], the injunction ordered issued by the trial court was modified and affirmed. As so modified the defendant, its agents and employees were enjoined from ''obstructing plain-

tiffs in the conduct of . . . their stable . . . or from in any wise molesting, interfering with, threatening, intimidating or harassing any employee or employees of plaintiffs . . . or from . . . placing in front of said plaintiffs' place of business any picket, or pickets, for the purpose of . . . molesting, intimidating or coercing, or attempt to molest or intimidate or coerce . . . any employee now or hereafter employed by, or working for plaintiffs in their said business.''

In *Southern Cal. etc. Co.* v. *Amalgamated Association of Iron, Steel and Tin Workers, supra,* this court set aside the judgment of the trial court and ordered a judgment entered which commanded the defendants ''to desist and refrain from directly or indirectly, or by any means or method doing, or attempting to do, any of the following described acts, with the intent or purpose of intimidating the employees of the plaintiff, so as to prevent them from continuing in said employment, or with the intent or purpose of intimidating persons intending to or about to enter such employment, so as to prevent them from becoming such employees, to wit: stationing or placing, or causing to be stationed or placed, on the street or elsewhere, at or near the plaintiff's place of business, any picket or pickets; . . . The aforesaid defendants are also enjoined from and commanded to desist and refrain from interfering or attempting to interfere in any manner with the free use, occupation, and enjoyment by the plaintiff, its agents, officers, servants, and employees of any of its property and premises of any kind or nature, or hindering or obstructing or attempting to hinder or obstruct, in any manner, the plaintiff's business or any part thereof; or molesting or interfering with or intimidating or harassing any employee of plaintiff or person who seeks to enter the employment of plaintiff''.

In *Lisse* v. *Local Union No. 31, supra,* the judgment was modified and ordered re-entered to read, in part, as follows:

'' 'It is therefore ordered, adjudged and decreed that defendants herein and each of them and all persons acting for them or either of them or in aid or assistance of them or either of them be and they are hereby perpetually enjoined and commanded to desist and refrain directly or indirectly or by any means or method from doing or attempting to do any of the following described acts: (a) intimidating, threatening, molesting or coercing plaintiffs in the conduct of their

business known as the "Rainbow Cafe" situated at No. 1218 Broadway Street, in the city of Oakland, California, or for any such purposes obstructing or otherwise interfering with, or attempting to obstruct or interfere with the free use, occupation and enjoyment thereof by plaintiffs, their agents, *servants* and *employees; . . .* ' '' (Emphasis added.)

Each of these cases, especially the later ones in point of time, stoutly uphold the constitutional right of free speech, the right of the workingman to organize, to strike, to conduct primary and secondary boycotts, to persuade other workers, by peaceful means, to leave their employment, to seek members of their labor organization and use other such means as may be lawful to promote their own interest and better their own working conditions. These are still the lawful rights of labor if lawfully exercised. It is made equally clear, especially by the injunction in the Lisse case, that an employee who so desires is given the right to the free use and occupation of his employer's premises free from obstruction or interference of anyone. An employee cannot have the free use and enjoyment of his employer's premises unless he has the right to freely enter upon and leave those premises free from obstruction or interference by anyone. Thus the lawful rights of the unions and their members to promote their own welfare, and the lawful right of the individual workman, whether unionized or not, to sell his labor, were both protected.

Here the picket line and the rule interfere with the free use and enjoyment of the employer's premises by all of its employees. Unless this court decides to overrule the four cases last considered, the order of the trial court should be reversed. Instead of overruling any of those cases, the majority opinion cites some of them with approval.

To argue that the picket line and the union rule has not coerced the union employees of the employer into refusing to enter their place of employment because they voluntarily obeyed the rule against crossing the picket line would be the purest sophistry. Union membership and free fraternization with other union members is a right that must be valued highly. Severe penalties for violation of the union rule are described in the complaint. A fine or other punishment are penalties provided for violation of the rule. It would be as logical to argue that penalties provided for the violations of statutes do not compel obedience to those laws. Here

the obedience by the union members, while in a sense voluntary, is none the less under compulsion of the rule, and the penalty to be imposed for its violation.

For these reasons the orders here for review should be reversed.

Rehearing denied. Shenk, J., Curtis, J., and Houser, J., voted for a rehearing.